## SANITARY CO. OF AMERICA v. COMMISSIONER OF INTERNAL REVENUE
(two cases).

Circuit Court of Appeals, Third Circuit.
August 22, 1929.

Nos. 4012, 4013.

S. Leo Ruslander, of Pittsburgh, Pa. (George R. Beneman, of Washington, D. C., and George K. Warn, of Pittsburgh, Pa., of counsel), for petitioner.

Mabel Walker Willebrandt, Asst. Atty. Gen., Sewall Key and Randolph C. Shaw, Sp. Asst. Attys. Gen., and C. M. Charest, Gen. Counsel, and Stanley Suydam, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. The first question involved in this case is whether the taxpayer corporation was entitled to a deduction in income by virtue of the Revenue Act of 1918, which authorizes such deduction for "losses sustained during the taxable year and not compensated for by insurance or otherwise." 40 Stat. 1067, § 214(a) (5). The entire proofs pertaining thereto were given by the witnesses called by the taxpayer. No contradiction of facts is involved. The question therefore was wholly one of deduction from undisputed facts. The Commissioner drew the conclusion no loss was shown, and on appeal the Tax Board agreed thereto. It follows therefore that, if there was proof from which such conclusion of no loss could be drawn, the judgment should be affirmed. On the other hand, if the conclusion of no loss had no proof to sustain it, then the judgment should be reversed.

Turning, then, to the proofs, we have the evidence that in 1918 the taxpayer corporation and the Keystone Motor Manufacturing Company negotiated for the taxpayer to buy and the Keystone Company to sell certain machinery and equipment. These negotiations were carried on by the officers of the companies who dealt at arms' length and in the ordinary course of business. The witness Rhoads, who, as secretary and president of the taxpayer company, was conversant with its affairs, but who had no connection with it when he testified, proved that the price of $41,300 was agreed upon in the negotiations in which he took part. This price was paid as follows: Cash, $5,000; first mortgage bonds of the taxpayer company, $15,000; 142 shares of its preferred stock, at its par value of $14,200; and 71 shares of its common stock, at its par value of $7,100—in all, $41,300. Rhoads testified that he was familiar with the values of such bonds and stocks, because of sales thereof made at that time at par and above; that his own bank bought at par, and sold and recommended them to its customers; that the bonds were part of an issue of $75,000, and the taxpayer company sold all the bonds at par and paid no commissions; that the preferred stock had a book value above par, and the company had also sold it at par without paying commissions; that the common stock showed a book value of $76 per share above par, and a capacity to pay dividends upon it, which it subsequently began to pay. The proofs further show that the price agreed on was a compromise between the prices contended for by the parties, viz.: The Keystone Motor Company contended for $50,000; the taxpayer for $30,507.34, based on an inventory of values made by itself for "the purpose of negotiations." Rhoads' testimony was corroborated

by Denning, who' represented the Keystone Company.

The opinion of the Tax Board sets forth that "the stock and bonds were considered by both parties to be worth their par value." It will thus be seen that there was no proof in the case from which any other conclusion could be drawn, save that the purchase price of $41,300 was the value of the machinery and equipment. Subsequently the taxpayer sustained an alleged loss of $10,699.54 on the disposition of these articles, and we think the testimony, which as we have said is not disputed, shows such was the case. To understand the case, we must view the situation as it was, and what the parties had in mind. The Keystone Company had a manufacturing plant, equipped in the main and ready to operate, and it regarded, and quite properly so, the value of the machinery, worth as a going plant, the $50,000 it placed upon it. On the other hand, the Sanitary Company had no intention of operating it, but regarded the plant as a scrapping proposition, the purchase of which would remove a competitor. From its standpoint it was therefore quite justified in putting upon the plant the scrap value of $30,507.34, which it did. Viewed, as a business proposition it is clear the Keystone Company was unable financially to operate the plant, and therefore had to lower its price, and it is equally clear the Sanitary Company could not get rid of its competition at a scrap price, for the Keystone Company insisted on getting enough out of it to pay its creditors. Therefore the short-cut compromise plan and price of $41,300 was agreed on, and that sum in its entirety went to the creditors of Keystone, with nothing left to its stockholders.

What followed was quite in the line of ordinary business. The Sanitary Company scrapped the plant, and incurred the loss which almost inevitably follows when a going plant is scrapped. It sold at the scrap prices of the inventory $15,876.57, and removed to other plants such articles, to the amount of $21,104.48, as it could use, and, after deducting freight and other expenses, placed its loss at $10,699.54. We find this course, carried out on the principles and practices usually incident to business, was a just and proper mode of ascertaining its loss. The refusal of the taxing authorities to allow for this loss was in our judgment reversible error. In arriving at such conclusion we note the case of Sample v. Commissioner (C. C. A.) 23 F.(2d) 671, is in accord therewith.

The next question concerns the inclusion in the taxpayer's invested capital for the year ending November 30, 1919, of $60,118.75, alleged value of the good will, and $121,725, alleged value of patents bought by the taxpayer from the Mitchell & Van Meter Company in 1910. The proofs, which are not in dispute, are as follows: That company had since 1904 been manufacturing soil pipe and plumbers' accessories. At its Linfield plant (for, while it had two other plants, we are here only concerned with the Linfield one) Rhoades, who was head bookkeeper for that company and afterwards for the taxpayer vendee, testified the plant had never lost money from 1904 onward, with the exception of 1921. He testified the products of the old Mitchell & Van Meter Company "were well and favorably known throughout the whole eastern section of the United States," and the Sanitary Company, by its purchase of that company in 1910, got "valuable sales connections and also quite a few patents and applications for patents." He testified he had been connected with the old company since 1907; that he and another person had made a report on values when the sale was made; that the Linfield plant was a profitable business; that it absolutely had a good will with the trade, and that its patents were absolutely of value; that he and his associate fixed a value of $615,125 at that time for all the physical assets, patents, and good will. Asked whether he considered the purchase of these assets necessary to the Sanitary Company, he testified "that the patents covered were absolutely necessary."

Going into details, he stated that the patent on the Ideal closet connection was very valuable, because of the price obtainable against the manufacturing cost, and the fact that they were able to prevent their competitors from making it; that the sole license for manufacturing the drain leader and cesspool was very valuable; that the sole license to manufacture the closet flange in connection with the Ideal closet connection was quite valuable, as was the application for the patent under which the improved Brooklyn running trap was manufactured without competition for quite a while; and that there were other applications for patents on a Mitchell & Van Meter boiler stand and several other articles, all of which were included in the patents. He also testified that the closet connection patent was very valuable, being made at a cost of 55 to 58 cents and sold at $1.05. Referring to the good will, he testified that the Mitchell & Van Meter Company were known all over the United States, especially in the metropolitan district and Philadelphia, and, in addition, they had valuable sales connec-

tions, which had marketed the products probably from the organization of the Mitchell & Van Meter Company, or shortly thereafter. He testified, further, that the Sanitary Company of America absolutely continued to mark its products with the Mitchell & Van Meter name after they took over the assets and sold to the public with that name on, until they started to use "SAACo" in a diamond, and he ventured to say "that the company has a lot of fittings on which the M. & V. M. trade-mark still appears"; that the company continued its business, advertising its products to the trade as being the M. & V. M. articles, or articles formerly manufactured by the Mitchell & Van Meter Company in catalogues or otherwise, innumerable cuts still bearing the trade name M. & V. M., because they did not want to go to the expense of destroying these cuts, and that they still have them, he imagined; that, aside from the expense of destroying the cuts, it was of value until the SAACo was started, at least, and that the trade accustomed to order these products would not specify M. & V. M. products on all items, but quite a few orders would still come through for M. & V. M. boiler stands.

Shuster, although a competitor in factory making of soil pipe, testified that he bought carloads from Mitchell & Van Meter; that they had a fine reputation; that no one else could supply their soil pipe; that they had a fine good will. Without entering into further details, we may say there were several other witnesses who testified to the substantial good will of the company before its sale in 1910, and to the continuance of that good will after that date toward the Sanitary Company of America, by customers asking for and specifying M. & V. M. goods, and the Sanitary Company continuing to sell them as such; and also, without going into details, we note the witness Rhoads testified that he regarded the item of good will, carried on the books at $60,118.75, and of patents, at $121,725, was a just value. This testimony was given over the objection of the government, on the ground "that the witness had not been shown to be qualified to state the values."

We cannot agree with this contention, nor can we agree with the holding by the board that "the only evidence of the value of good will and patents concern subsequent earnings." Bearing on both contentions, we believe that Rhoads' position with both companies, and his experience and long service with them in a responsible position, qualified him to speak, and that his testimony bore on the profitable character of the Mitchell &

Van Meter Company before the sale, and not alone, as the government contended, to a period subsequent thereto. It will be noted, also, that the values so placed were not speculative, or open to the charge of being made to avoid taxation. On the contrary, they were prices agreed upon in good faith, in the routine of business, and at periods considerably antedating the statutes here involved.

In view of what we have said, we are of opinion the holding of the board must be set aside, and that as provided by stipulation, the same applies to case No. 4013.